# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE ESTATE OF PABLO GARCIA TORIBIO, ET AL.**, <br><br> Plaintiffs, <br><br> vs. <br><br> **CITY OF SANTA ROSA, ET AL.**, <br><br> Defendants. | CASE NO. 18-cv-02151-YGR <br><br> **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** <br><br> Dkt. No. 45 |

Decedent Pablo Garcia Toribio ("Garcia") was shot and killed by an officer of the Santa Rosa Police Department ("SRPD") on August 5, 2017. Plaintiffs herein are Pablo Garcia Santos and Margarita Toribio Dominguez, the parents of decedent Pablo Garcia Toribio, as well as decedent's estate. The operative complaint in this matter alleges twelve causes of action against defendants SRPD Officers Vlahandreas, Badger, and McAllister; SRPD Chief of Police Hank Schreeder; and City of Santa Rosa.

Pending before the Court is defendants' motion for summary judgment, which came on regularly for hearing on February 26, 2019. (Dkt. No. 45.) At the hearing on this matter, plaintiffs declared that they were withdrawing their claims against all defendants except Officer Vlahandreas. (*See* Order Dismissing Claims Against Defendants City of Santa Rosa, Schreeder, Badger, and Mcallister, Dkt. No. 72.) Thus, the remaining claims, against Officer Vlahandreas only, are: wrongful death; negligence based upon wrongful death and failure to intercede; violation of California Civil Code section 52.1 (the Bane Act); and, pursuant to 42 U.S.C. section 1983, violation of the Fourth and Fourteenth Amendments of the United States Constitution based upon excessive force and interference with familial association.

Defendant argues the undisputed material facts demonstrate that he has no liability on any claim. Defendant contends the evidence does not establish that he used objectively unreasonable

force in responding to the incident at issue and, as a matter of law, qualified immunity and California statutory immunities would bar the claims.

Having carefully considered the papers submitted, the arguments of the parties at the hearing, the admissible evidence,[1] and the pleadings in this action, and for the reasons set forth below, the Court **ORDERS** that the motion is **GRANTED**.

## I. SUMMARY OF FACTS

Unless otherwise noted, the facts stated below are undisputed. The Court recounts the events in some detail but notes that the interaction between decedent and the officers here unfolded in a matter of about ten minutes from the time they arrived in response to the 911 call to the time Officer Vlahandreas fired his gun.

At 5:45 a.m. on August 5, 2017, Augustin Salgado Chavez ("Salgado") was awakened by his roommate, decedent Garcia, who was in their shared bedroom shouting obscenities, naked, and acting erratically. (Defendants' Statement of Undisputed Facts and evidence cited therein [hereinafter "Def. Fact"] 3; Plaintiffs' Additional Facts, Dkt. No. 69, and evidence cited therein [hereinafter "Pl. Fact"] 2.) Garcia was wielding a 12-inch long kitchen knife with an 8-inch long blade. Garcia jumped onto Salgado's bed and blocked Salgado from leaving through the bedroom door, screaming, "You're not getting out, asshole." (Def. Facts 3, 4.) Garcia slashed at Salgado with the knife twice. Salgado avoided being cut in his mid-section by arching his body away, but suffered a cut on his right leg, just above the knee.[2] (Def. Facts 4, 5.) From Garcia's statements and actions, it appeared to Salgado that Garcia was hallucinating about a chicken running around in the room. (Jackson Decl., Exh. A at 32:3-17.)

Salgado jumped out the bedroom window, circled around the house, knocked on the

---

[1] Defendant objected to certain evidence and statements of fact submitted by plaintiffs. (Reply, Dkt. No. 70.) The Court rules on those objections as follows: (1) Objection 1 is **OVERRULED**; (2) Objections 2, 3, and 4 (to Plaintiffs' Additional Facts 5, 6, and 11) are **SUSTAINED** on the grounds stated; and (3) Objection 5 (to Additional Fact 12) is **SUSTAINED IN PART** and the evidence is admissible as to Officer Badger's training only.

[2] Salgado testified: "he reached for me with a knife. But I moved back. If I had not pushed back, then he would have disemboweled me . . . . he would have killed me there. He would have cut my intestines." (Declaration of Robert Jackson, Exh. A [Deposition of Agustin Salgado Chavez at 22:5-7, 17-18].)

bedroom window of the home's owner, Ventura Hernandez, telling him that Garcia was acting "really crazy" and had cut him with a knife. (Def. Fact 6.) A few minutes later, Hernandez called 911 and told the dispatcher, in Spanish:

> I need for [police] to come fast here, because there is a guy who is acting all crazy here. I don't know if he drinks something or something . . . he was in his room. He was taking a nap there. And, also, he has a knife.

(Def. Fact 7.) When asked what the man did with the knife, Hernandez replied, "yes, he did threaten someone." (*Id.*) Salgado then got on the phone line and, speaking through an interpreter and crying, told the 911 operator "he's my roommate and he was acting crazy." (*Id.*)

At 5:59:55 a.m., the 911 dispatcher broadcast a "415" (fighting/disturbance of the peace) and notified officers of "a male requesting police quickly" who "says there's a subject here acting crazy." (Def. Fact 8.) At 6:02:43 a.m., the 911 dispatcher broadcast:

> Units responding to West Steele Lane. Apparently the subject rents a room there. He was sleeping, woke up acting strange, and RP heard somebody saying something about a knife, but the RP has not seen the knife for himself.

(*Id.*)

At approximately 6:00 a.m., Officers Badger and Turner arrived at the home, noticed the front door was wide open, and waited for backup to arrive. (Def. Fact 9.) At approximately 6:06 a.m., Officers Turner and Badger walked to the front door, knocked and announced themselves, and entered through the open front door. (Def. Fact 10.) Hernandez came to the door and spoke to the officers in Spanish, which they were unable to understand. Defendant Officer Vlahandreas, who could speak and understand some Spanish, arrived shortly thereafter and spoke in Spanish to Hernandez. (*Id.*) The three officers walked into the entryway of the home and encountered Salgado, who they observed was still talking to the 911 dispatcher on the telephone, visibly distraught, crying, and bleeding. (Def. Fact 11.) Salgado also spoke to the officers in Spanish. Officer Vlahandreas was not able to understand all that Salgado said, but understood Salgado was indicating he had been cut. The officers observed a bleeding cut on Salgado's leg, although the severity of the cut is disputed by the parties. (*Id.*)

At 6:07 a.m., Officer Badger radioed dispatch to send a medical unit to treat Salgado. (Def. Fact 12.) Hernandez and Salgado indicated to the officers that the man with the knife was in

3

a bedroom. (*Id.*) Officer Badger tried the door to the bedroom, found the door locked, and requested the keys from Hernandez. They unlocked the bedroom door, and Officers Turner and Badger announced themselves as "Santa Rosa Police," while opening it. With their flashlights they peered into the dark bedroom. They observed overturned beds and mattresses, and did not see Garcia initially. (*Id.*)

At 6:09 a.m., Officer Badger directed Officer Vlahandreas to remain inside while he and Officer Turner went to the back of the house to see if Garcia might have escaped through the bedroom window to the back yard.[3] Officer Vlahandreas remained in the home and spoke more to Hernandez and Salgado in Spanish in the living room down the hallway from the bedroom. Officer Vlahandreas concluded that Salgado had been cut by a knife, which could be charged as assault with a deadly weapon, a felony. (Def. Fact 13.)

Officer Vlahandreas suddenly heard a sound come from the bedroom the officers previously had checked. He went back to the doorway of the bedroom, announced himself "policia," looked inside, and radioed to Officer Turner to return from the backyard. (Def. Fact 14.) Officers Turner and Badger returned, and Officer Turner escorted Salgado outside to receive medical attention for his cut. Officer Badger joined Officer Vlahandreas at the doorway to the bedroom.[4] (Def. Fact 15.)

At 6:11 a.m., Officer Vlahandreas discovered Garcia, naked and lying beneath an overturned mattress in the bedroom. Officers Vlahandreas and Badger both announced themselves in Spanish as "policia" and ordered Garcia to "come out now" from beneath the mattress several times, but Garcia did not comply.[5] (Def. Fact 16.) Garcia remained in the room and in his unclothed state.

---

[3] In addition to Salgado and Hernandez, there were several other people in or nearby the house at the time of these events, including Hernandez's wife in another bedroom in the house, three other men staying in an attached garage, and a woman and two children staying in an outbuilding behind the house. (Def. Fact 2.)

[4] The bedroom was ten feet by ten feet. The hallway outside the bedroom was three feet wide and fifteen and a half feet long. (Def. Fact 1.)

[5] It is undisputed that Garcia spoke and understood Spanish, as well as speaking and understanding some English. (Def. Facts 17, 18.)

4

At 6:12 a.m., the officers saw that Garcia had a 12-inch kitchen knife in his hand. Officer Badger told Vlahandreas to "get your Taser out." Officer Vlahandreas radioed to dispatch, "subject has a knife." (*Id.*) The officers commanded Garcia to drop the knife, "manos arriba" ("hands up," in Spanish), "put the knife on the ground," and "put the knife down and let me see your hands," while Vlahandreas pointed the Taser at him. (Def. Fact 20, Declaration of Jeffrey Badger, Exh. I [Body Worn Camera Video ("Badger BWC")] at 6:12.) Garcia did not comply or respond. (Def. Fact 16, 19.) He was silent as the officers gave their orders. (Badger BWC 6:12.)

At 6:13 a.m., Garcia placed the knife on his stomach as he lay with his back on the floor. (Def. Fact 21.) Officer Badger stated "it's on his stomach" to Officer Vlahandreas. (Badger BWC 6:13.) The officers continued to repeat in Spanish and English, "policia," "manos arriba," "let me see your hands," "put the knife down." (Def. Fact 21.) Garcia began mumbling and groaning. (Badger BWC at 6:13.)

At 6:14 a.m., the officers continued to command Garcia to put the knife down and "manos arriba." (Def. Fact 21.) Officer Badger stated, "he's grabbing it." (Badger BWC at 6:14.) The officers continued to state "put the knife down" and "manos arriba." (*Id.*) The officers were inside the doorway of the bedroom as they spoke to him. (*Id.*) Suddenly, Garcia sat up, holding the knife and muttering, and the officers backed away from him and toward the doorway. (*Id.*) Officer Vlahandreas spoke to Garcia in Spanish, "Señor, está bien" ("Sir, it's okay.")[6] Garcia did not put the knife down. Officer Vlahandreas aimed at Garcia and discharged his Taser. (Def. Fact 21, 22.) The officers continued to command Garcia to "put it down now." (Badger BWC at 6:14.) Still, Garcia continued to hold onto the knife. (Def. Fact 23.) The officers backed away from the bedroom doorway into the hallway. Officer Vlahandreas discharged his Taser again, and Officer Badger drew his Taser. (Badger BWC at 6:14.) The Taser strikes appeared to have little effect either time.

At 6:15 a.m., as the officers continued to command Garcia to put the knife down, Garcia

---

[6] Officer Vlahandreas seems to have said: "Señor, está bien. Estoy aqui para ayudar," which in English means, "Sir, it's okay, I am here to help." (Badger BWC at 6:14.)

5

began waving the knife and talking to the officers in English. (Badger BWC at 6:15.)[7] Garcia shifted his hold on the knife in such a way that Officer Badger stated to Officer Vlahandreas, "he is going to cut his arm." (Def. Fact 23.) The officers continued to state "put the knife down now," "hands up," and "manos arriba." (Badger BWC at 6:15.) Officer Vlahandreas suggested the use of pepper spray to Officer Badger, and then leaned in the doorway to deploy pepper spray in the direction of Garcia's face. (Def. Fact 23.) When the officers again commanded Garcia to put the knife down, he stated "I can't, I got burning." (*Id.*)

At 6:16 a.m., Officer Badger said "Señor, manos arriba." (Badger BWC at 6:16.) Garcia stated what sounded like, "I told you I don't want kill people." (*Id.* [10:32 mark[8]].) Officer Badger responded, "then put the knife down now." (*Id.*) Garcia argued with the officers in an incoherent way. (*Id.*) Officers Vlahandreas and Badger stated repeatedly, "We're here to help you," "put the knife down." (Def. Fact 24.) Garcia responded, "You understand what I am saying, please?" and "I don't want help; I wanna . . . myself." (Def. Fact 24.) During this interchange, the officers remained just outside the bedroom door frame. (Badger BWC at 6:16.)

At 6:17 a.m., Officer Vlahandreas asked Garcia, "What's going on?" Garcia responded, "I say no; that's it," and "this ends now." (Def. Fact 25.) Officer Badger again said "We're here to help you, put the knife down." (Badger BWC 6:17 [11:31 mark].) Officer Vlahandreas then said, "We can't help you if you don't tell us what's going on." (Def. Fact 24.) Garcia responded "go" and growled, and then " . . . kill you," to which Officer Vlahandreas responded, "You don't want to do that sir; we're here to help you." (*Id.*; Badger BWC at 6:17 [11:58 mark].) Garcia said, "clean my eyes please . . . clean my eyes . . . need fav gramma grams too[*sic*] . . .please clean my eyes I have to." (Badger BWC at 6:17 [12:00-06 mark].) Garcia then quickly rose to a standing position, still holding the knife, and yelled "clean them." (Def. Fact 24; Badger BWC 6:17 [12:10 mark].) Garcia jumped over the bed frame and began to rush over objects strewn over the

---

[7] Garcia seems to have said: "I . . . tell no more. I say leave. I have the knife for real." (Badger BWC at 6:15 [9:38 mark].)

[8] Where possible, the Court has included the time "mark" for the time lapsed in the videos provided, in addition to the time of day stamp shown in the videos.

bedroom floor toward the doorway where Officer Vlahandreas and Officer Badger stood. (Def. Fact 26; Badger BWC at 6:17 [12:14 mark].) The officers again yelled "put the knife down," "put it down." (*Id*. [12:16 mark].) Officer Badger fired his Taser at Garcia, and Garcia groaned. (Def. Fact 26; Badger BWC at 6:17 [12:17 mark].)

At 6:18 a.m., Garcia suddenly ran toward the doorway, knife in hand, toward the officers. (Def. Fact 27; Badger BWC at 6:18 [12:23 mark].) The officers retreated from the doorway, backing in opposite directions down the hallway, shouting for Garcia to drop the knife. (Def. Fact 27.) Garcia scrambled from the bedroom still holding the knife. At the moment he emerged from the bedroom with the knife, Garcia was approximately six to eight feet from Officer Vlahandreas and nine to ten feet from Officer Badger. (*See* Def. Fact 28, Pl. Fact 9.)

Officer Vlahandreas fired five shots as Garcia dashed across the hallway, knife in hand, into what the officers later learned was a bathroom, and closed the door behind him. (Def. Fact 35.) Officer Vlahandreas did not know if Garcia was hit or to what degree he was incapacitated. (*Id.*)

About 14 minutes later, after obtaining a shield, Officer Badger entered the bathroom and found Garcia lying prone on the bathroom floor with the knife next to him. (Def. Fact 37.) The officers later determined that Garcia had been hit by one or two rounds in his hip region and one or two in his armpit area, on Garcia's left side, the side facing Officer Vlahandreas as Garcia ran from the bedroom to the bathroom. (Pl. Fact 12; Pl.'s Exh. A, Vlahandreas Depo. at 50.) Garcia died at the scene.

## II.   APPLICABLE STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

7

*Id.* 56(c)(1)(A), (B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A moving party defendant bears the burden of specifying the basis for the motion and the elements of the causes of action upon which the plaintiff will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the plaintiff to establish the existence of a material fact that may affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In the summary judgment context, the court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). If the plaintiff "produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by" defendants. *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1277 (9th Cir. 2017). "[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from facts are jury functions, not those of a judge." *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014) (alteration in original) (quotation omitted). Thus "where evidence is genuinely disputed on a particular issue—such as by conflicting testimony—that issue is inappropriate for resolution on summary judgment." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (internal quotation mark omitted); *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002) (same).

### III. DISCUSSION

#### A. Section 1983 Claims for Excessive Use of Force and Interference With Familial Association

*1. The Undisputed Facts Establish No Fourth Amendment Violation*

Officer Vlahandreas moves for summary judgment on plaintiffs' claims for excessive use of force and interference with familial association under Section 1983 on the grounds that he did not use objectively unreasonable force in shooting and killing Garcia, and that he has qualified immunity for those actions. Based upon the undisputed facts here, the Court agrees that Officer

Vlahandreas did not act unreasonably in his use of deadly force under the circumstances.

The Fourth Amendment of the United States Constitution guarantees citizens the right "to be secure in their persons" against "unreasonable seizures." *See Graham v. Conner*, 490 U.S. 386, 394 (1989); *Tennessee v. Garner,* 471 U.S. 1, 6. (1985). "[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Garner*, 471 U.S. at 7.

"[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . [and] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Garner,* 471 U.S. at 8–9 and *Bell v. Wolfish,* 441 U.S. 520, 559 (1979)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396–97. "[H]owever, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. If a suspect threatens the officer with a weapon or if there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used. *Garner*, 471 U.S. at 11-12. Other factors in the calculus include the availability of alternative methods, whether proper warnings were given, and whether the officers knew or should have known that the suspect was emotionally disturbed. *See S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017). The Ninth Circuit has repeatedly emphasized that the most important factor is "whether the suspect posed an immediate threat to the safety of the officers or others." *See, e.g., id.*

Here, Garcia wielded a knife with an eight-inch blade, acted erratically, and refused to comply with orders to drop the knife even after the officers deployed Tasers and used pepper spray to subdue him. As the officers spoke to him, Garcia made threatening statements ("kill you") and

9

argued incoherently with them about putting down the knife. Ultimately, Garcia charged toward the doorway where the officers were standing with the knife in his hand, pointed in their direction.[9] This Court has reviewed the body-worn camera footage, both at regular speed and slowed down considerably. The footage clearly depicts that the distance between Garcia and the officers, and the speed with which Garcia was moving, put the officers' life and safety in jeopardy. Compounding this, Vlahandreas understood that Garcia's roommate had stated that Garcia cut him with the knife before the police were called.

While it is true that evidence of a suspect's emotional disturbance or mental illness may also factor into the reasonableness calculus, the Ninth Circuit expressly declined to adopt a "per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001). Instead, the Ninth Circuit has held that such concerns must be taken into account in assessing reasonableness, and that "the governmental interest in using [deadly] force is diminished" if the suspect has not committed a serious crime but merely shows signs of mental illness or emotional distress. *Id*. In sharp contrast to the circumstances here, *Deorle* involved the shooting of an unarmed, suicidal individual who had committed no offense, was compliant with the officers' commands over the course of a half hour of negotiations, was well away from officers and other people, and had threatened harm to no one but himself. *Id*.

Other cases concerning mentally disturbed suspects likewise diverge from the facts here. For instance, in *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011), police fatally shot a distraught and intoxicated teenaged boy who had threatened to kill himself with a pocket knife. The court held that the officers did not act reasonably given that the boy had not committed any offense, had not threatened anyone other than himself, was not attempting to flee or resist the officers, and put his hands down when the officers hit him with less lethal beanbag rounds. *Id*. at

---

[9] Plaintiffs' statement of additional facts suggests that Garcia "never held the weapon upward and facing [Vlahandreas] as if in an aggressive manner" and Garcia "never charged" Vlahandreas. (Pl. Fact 11.) The evidence cited by plaintiffs does not support that statement. Moreover, the statement is contradicted by the body camera footage showing that Garcia held the knife pointing outward and in front of him as he charged through the doorway where the officers were standing. (Vlahandreas BWC at 6:18 [0:41 mark].)

10

873-80. Though he had a three-inch pocketknife, he held it to his own neck and did not threaten anyone else with it. *Id*. at 872-73.

Here, while the evidence shows Garcia was under a mattress, nude, and in an altered mental state when police first found him, it also indicates Garcia had assaulted his roommate by cutting him with a large knife. Further, Garcia would not comply with the officers' commands for him to drop the knife, both in English and in Spanish—commands he clearly understood based on his responses to the officers' directions. The body-worn camera footage shows that Garcia made statements threatening to "kill you" and charged in the officers' direction with the knife. While Garcia's statement that he needed to wash his eyes, and his dash across the hallway toward what was later determined to be a bathroom, might imply that he did not intend to attack the officers, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham,* 490 U.S. at 396. The circumstances are thus more analogous to those where the Supreme Court has held that "the use of potentially deadly force was justified." *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015) (after officers attempted to subdue mentally ill suspect with pepper spray and she continued to advance on them with a large knife until she was "a few feet from" one officer, "[n]othing in the Fourth Amendment barred [the officers] from protecting themselves, even though it meant firing multiple rounds.") Under the undisputed circumstances here, Officer Vlahandreas did not act unreasonably in using deadly force.[10]

### 2. *Officer Vlahandreas Is Entitled to Qualified Immunity*

Even if the Court were to find the evidence disputed as to whether Officer Vlahandreas acted unreasonably, summary judgment nevertheless must be granted on the Section 1983 claims on account of qualified immunity. Qualified immunity is a question of law, not of fact. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008). The qualified immunity doctrine shields a government official performing discretionary functions from liability for civil damages if

---

[10] At oral argument, plaintiffs' counsel suggested that Officer Vlahandreas was younger and less experienced than his partner on the scene who did not fire his gun, Officer Badger. In fact, Officer Vlahandreas is about a year older and has served as an officer about a year longer than Officer Badger. (Vlahandreas Decl. para. 2-3; Badger Decl. para. 2.)

11

the officer's conduct does not violate a "clearly established statutory or constitutional right of which a reasonable person would have known." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018); *White v. Pauly*, 137 S.Ct. 548, 551 (2017). "Because the focus is on whether the officer had fair notice that [the] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (*per curiam* ). "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (*per curiam*) (internal quotation marks omitted). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue. *Id.* at 309 (internal quotation marks omitted and emphasis deleted); *Kisela*, 138 S. Ct. at 1152–53 (same). While the doctrine "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White,* 137 S.Ct. at 551; *Kisela*, 138 S.Ct. at 1152.

In *Kisela*, the Supreme Court considered circumstances in which a woman called 911 to report that her roommate was acting erratically and cutting at a tree with a kitchen knife. Three officers responded to find one woman standing near a car in a driveway, and another emerging from the house next to the driveway, holding a large knife. *Id.* at 1151. The woman with the knife walked toward the woman in the driveway and stopped about six feet away from her. Both women were on the opposite side of a chain-link fence from the officers. The officers commanded the suspect to drop the knife at least two times, but she did not comply. Moments later, one officer shot the suspect through the chain-link fence. The officers testified that they believed the woman near the car was in danger. They later learned that the suspect had a history of mental illness. *Id.*

Overturning the Ninth Circuit's finding of a Fourth Amendment violation and denial of qualified immunity, the Supreme Court held that the foregoing facts presented "far from an obvious case in which any competent officer would have known that shooting [the suspect] to

protect [the roommate] would violate the Fourth Amendment." *Id*. at 1153. The *Kisela* court further concluded that, "even if a controlling circuit precedent could constitute clearly established law in these circumstances, it does not do so here." *Id*. (quoting *Sheehan,* 135 S.Ct. at 1776). The Court found that "not one of the decisions relied on by the Court of Appeals," including *Deorle* and *Glenn, supra*, "support[ed] denying [the officer] qualified immunity." *Id*. at 1154.

*Kisela* is squarely on point with the facts here. Plaintiffs have offered no authority, nor has the Court found any, that would displace the Supreme Court's holding qualified immunity applies to an officer in similar circumstances.[11] In sum, no clearly established precedent would have put Officer Vlahandreas on notice that use of deadly force under the circumstance would be unreasonable. *Cf. Blanford v. Sacramento Cty.*, 406 F.3d 1110, 1116 (9th Cir. 2005) (officers entitled to qualified immunity for use of deadly force where they reasonably believed suspect posed a serious danger to themselves and others where suspect was acting erratically, wielding a sword as he walked through a residential neighborhood, and he failed to heed commands to put down the sword). Where a court can identify no authority supporting a "clearly established right" with "contours…sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it," summary judgment on qualified immunity grounds is appropriate. *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019); *accord Kisela*, 138 S.Ct. at 1153-54.[12]

---

[11] Indeed, the Supreme Court in *Sheehan* stated that even if the officers should have handled a confrontation differently based upon a suspect showing signs of mental illness, their failure to follow such training does not negate qualified immunity. *Sheehan*, 135 S. Ct. at 1777 ("a plaintiff cannot 'avoi[d] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless'") (internal citation omitted). The Court further notes that plaintiffs offered no expert evidence in opposition to the motion.

[12] Plaintiffs' citation to the district court decisions in *Reed v. City of Modesto*, 122 F.Supp.3d 967 (E.D. Cal. 2015) and *Kaur v. City of Lodi*, 263 F.Supp.3d 947 (E.D. Cal. 2017) is unavailing, both because the decisions are factually distinguishable and because such trial court decisions cannot establish controlling Constitutional precedent. *See Sheehan*, 135 S.Ct. at 1776 (questioning without deciding whether "a controlling circuit precedent could constitute clearly established federal law in these circumstances" for purposes of Section 1983 qualified immunity analysis); *Carroll v. Carman,* 135 S.Ct. 348, 350 (same); *Reichle v. Howards*, 132 S.Ct. 2088, 2094 (2012) (same).

13

**B.      Wrongful Death, Negligence, Failure to Intercede, and Bane Act Claims**

Officer Vlahandreas further moves for summary judgment on plaintiffs' wrongful death (battery), negligence, failure to intercede, and Bane Act claims on the grounds that: (1) California Government Code section 845.8 and California Penal Code section 196 give him immunity from liability; and (2) the failure to establish a violation of the Fourth Amendment likewise establishes his lack of liability for these claims. In their opposition, plaintiffs fail to address the merits of these arguments. The Court has considered them nevertheless.

With respect to the Bane Act violation, California Civil Code section 52.1 requires a showing that the defendant interfered with the exercise of an individual's rights secured by the Constitution by "threat, intimidation or coercion." *Austin B. v. Escondido Unified Sch. Dist.*, 149 Cal.App.4th 860, 880-881 (2007). A Bane Act claim further requires a showing of intent on the part of the officer to violate the Constitutional right at issue. *Reese v. City of Sacramento*, 888 F.3d 1030,1044 (9th Cir. 2018); *Sandoval v. Cty. of Sonoma*, 912 F.3d 509, 520 (9th Cir. 2018). Here, because the Court finds that Officer Vlahandreas' conduct does not establish a Fourth Amendment violation, plaintiffs' Bane Act claim founders as well. Moreover, plaintiffs submitted no evidence to suggest that Officer Vlahandreas acted with the intent to deprive Garcia of his Constitutional rights.

With respect to the remaining claims tort claims, Officer Vlahandreas contends that he is immune under California law and that the failure to establish a Fourth Amendment violation nevertheless requires their dismissal. First, two forms of state statutory immunity preclude the claims against an officer under these circumstances: immunity for all injuries caused by a person resisting arrest (Cal. Gov't Code § 845.8) and peace officer immunity for a killing that "was necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty" (Cal. Penal Code § 196). Further, claims for negligence or battery arising out of the alleged use of unreasonable force by a police officer are analyzed under the same objective reasonableness standard as under the Fourth Amendment. *Hernandez v. City of Pomona*, 46 Cal. 4th 501, 514 (2009) ("California's civil jury instructions specifically direct the jury, in determining whether police officers used unreasonable force for purposes of tort

14

1 liability, to consider the same factors that the high court has identified [for a section 1983 action]"); *Lopez v. City of Los Angeles*, 196 Cal.App.4th 675, 685 (2011); *Hernandez v. City of Pomona,* 46 Cal.4th 501, 513-515 (2009); *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (1998) (battery by police officer requires showing unreasonable force was used). The Court agrees that both the statutory immunities and plaintiffs' failure to create a triable issue on the Fourth Amendment violation require that the motion for summary judgment on these remaining claims be granted in Officer Vlahandreas' favor.

### IV. CONCLUSION

The events of August 5, 2017, are undeniably tragic. The loss of Garcia's life was a sad consequence of the circumstances confronting the police officers when they responded to the 911 call. Until the higher courts address the Fourth Amendment's requirements when law enforcement engage with persons suffering from a mental disturbance, this Court has grave concerns that officers will believe themselves entitled to pull a trigger too quickly. That said, given the current state of the law, the tragedy here cannot be compounded by holding a police officer liable for damages under circumstances which demonstrate no violation of Constitutional limits on the use of deadly force, much less "clearly established" authority that such force would be unreasonable. In light of the foregoing, the motion for summary judgment is **GRANTED**. Judgment shall be entered in favor of defendant.

This terminates Docket No. 45.

**IT IS SO ORDERED.**

Dated: April 4, 2019

_____
**YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE**